# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MISSOURI ALLIANCE FOR ANIMAL
LEGISLATION,
    P.O. Box 300036
    St. Louis, MO 63130

    and

 STOP ANIMAL EXPLOITATION NOW,
    1081-B State Route 28 #280
    Milford, OH 45150

              Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE;
    1400 Independence Ave., S.W.
    Washington, DC 20250

ANIMAL AND PLANT HEALTH INSPECTION
SERVICE;
    4700 River Road
    Riverdale, MD 20737

ANIMAL CARE;
    4700 River Road, Unit 84
    Riverdale, MD 20737

and

SONNY PERDUE, in his official capacity as
United States Department of Agriculture Secretary,
    1400 Independence Ave., S.W.
    Washington, DC 20250

              Defendants.

Civil Action No. 1:19-cv-02087-DLF

**First Amended Complaint**

## FIRST AMENDED COMPLAINT

Plaintiffs Missouri Alliance for Animal Legislation ("MAAL") and Stop Animal Exploitation Now ("SAEN") bring this action against UNITED STATES DEPARTMENT OF AGRICULTURE, ANIMAL AND PLANT HEALTH INSPECTION SERVICES, ANIMAL CARE, and SONNY PERDUE (collectively, "USDA" or "Defendants"). Plaintiffs, based on personal knowledge as to themselves, on the investigation of their counsel, and on information and belief as to all other matters, allege as follows:

### NATURE OF ACTION

1.      USDA unlawfully issued two legislative rules that grant rights to industries like large-scale commercial dog breeders, laboratories conducting for-profit animal-based research, and road-side zoos exhibiting exotic animals. The rules at issue allow these industries to, among other things, conceal violations of the Animal Welfare Act from the public, retailers, and unsuspecting consumers—even in instances impacting animal welfare. Although the substantive effect of these rules are grave, they were unlawfully enacted without the opportunity for public notice and comment. Worse yet, these rules compound already-existing and well-documented enforcement deficiencies.

2.      For example, in 2010, the USDA Office of Inspector General ("OIG") issued a report reprimanding USDA's failure to adequately enforce the Animal Welfare Act ("AWA") against "problematic" large-scale dog breeders and brokers, commonly referred to as "puppy mills."[1] The report reviewed in painful detail USDA's pattern and practice of failing to enforce

---

[1] Audit Report 33002-4-SF, "Animal and Plant Health Inspection Service Animal Care Program Inspections of Problematic Dealers" (May 2010).

penalties against dog breeders for violations of the AWA—even in the face of repeat violations, apparent illness and injury, and tick and cockroach infestations.[2]

3.      Since the 2010 OIG report, several states and local governments have passed anti-puppy-mill legislation, making it more difficult and costly for large-scale dog breeders with USDA-cited violations of the AWA to sell puppies to retailers and, ultimately, consumers.

4.      Despite criticism against USDA for its under-enforcement of the AWA from both the public and OIG, Defendants adopted the teachable-moments rule ("TM Rule") and the self-reporting rule ("Self-Reporting Rule"), which both allow AWA licensees/registrants[3] to avoid receiving citations from USDA for violations of the law, even in instances impacting animal welfare. For example, pursuant to the TM Rule, an AWA licensee received a "teachable moment" in lieu of a citation for a violation of the law resulting in the death of an animal. Pursuant to the Self-Reporting Rule, another AWA licensee self-reported a violation of the law resulting in the death of an animal, yet did not receive a citation.

5.      The TM Rule and Self-Reporting Rule are legislative rules that, among other things, grant substantive business advantages, rights, and benefits upon AWA licensees, while imposing significant effects on private interests, state regulators, the public, and animals.

6.      For example, industries like large-scale commercial dog breeders rely on and benefit from the TM Rule and the Self-Reporting Rule, as they use it to circumvent the reach of state and local anti-puppy-mill legislation through obfuscating the nature and extent of their AWA violations. This obfuscation has a substantial impact on dog retailers—many of whom advertise

---

[2] *Id*. at 8–14.

[3] For ease of reference, Plaintiffs hereafter refer to AWA licensees/registrants collectively as "licensees."

the conditions of origin of puppies for sale—as well as consumers, interested in responsibly sourcing their family companions.

7.      Bipartisan Members of Congress have specifically cited "teachable moments" as "evidence … that [USDA] has lapsed back into behavior the 2010 OIG report identified as ineffective and counter-productive to enforcing the [AWA] for commercial dog breeders" and is "once again neglecting to proactively share information about possible cruelty violations with State authorities and law enforcement."[4]

8.      The TM Rule and Self-Reporting Rule, however, were unlawfully promulgated; USDA adopted these legislative rules without first providing notice and an opportunity for interested parties to comment under 5 U.S.C. § 553.

9.      Pursuant to 5 U.S.C. § 706, Plaintiffs seek to hold unlawful and set aside Defendants' TM Rule and Self-Reporting Rule on the basis that each was issued without first providing notice and an opportunity for interested parties to comment under 5 U.S.C. § 553, and therefore each is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and issued without observance of procedure required by law.

## JURISDICTION AND VENUE

10.      This Court has authority to review final agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, and has jurisdiction over this action seeking such review under 28 U.S.C. § 1331.

11.      Venue is proper in this judicial district under 28 U.S.C. § 139l(e) as this civil action is brought against an agency of the United States and an officer of the United States acting in his

---

[4] Letter from Rep. Mark Pocan and Rep. Brian Fitzpatrick to the Honorable Phyllis K. Fong, Inspector General, USDA OIG (Dec. 2017), *available at* https://bit.ly/2qd1j5f.

official capacity, and Defendant USDA resides in this district.

## PARTIES

12.    Plaintiff MAAL is a non-profit organization pursuant to section 501(c)(4) of the Internal Revenue Code, and is headquartered in Missouri. MAAL's mission is to prevent cruelty to animals, particularly companion animals, through education, legislation, investigations, and advocacy. Among other things, MAAL helps investigate commercial dog breeders and animal cruelty with respect to dogs. MAAL's efforts to protect commercially bred dogs, protect consumers, institute animal protection investigations, and educate the public are injured by Defendants' issuance and enforcement of the TM Rule and Self-Reporting Rule, and by Defendants' failure to comply with the APA.

13.    Plaintiff MAAL brings this action on its own behalf because the challenged conduct directly conflicts with, impairs, and frustrates its organizational mission, and has required MAAL to divert and redirect its limited resources to counteract and offset Defendants' unlawful conduct and omissions. The diversion of MAAL's resources to offset Defendants' unlawful and unfair conduct hinders the development of other organizational projects that would better advance MAAL's mission and increase MAAL's visibility, influence, and membership.

14.    Plaintiff SAEN is a non-profit organization pursuant to section 501(c)(3) of the Internal Revenue Code, and is headquartered in Ohio. SAEN's mission is to prevent abuse of animals in research facilities and facilities breeding/dealing animals for research. SAEN works to achieve this mission through cruelty investigations, research, filing complaints regarding facilities violating the AWA, and educating the public about animal mistreatment in research and breeding facilities through the media. SAEN's animal protection investigations and public education efforts

are injured by Defendants' issuance and enforcement of the TM Rule and Self-Reporting Rule, and by failure to comply with the APA.

15.     SAEN brings this action on its own behalf, because the challenged conduct directly conflicts with, impairs, and frustrates its organizational mission and has required SAEN to divert and redirect its limited resources to counteract and offset Defendants' unlawful conduct and omissions. The diversion of SAEN's resources to offset Defendants' unlawful and unfair conduct hinders the development of other organizational projects that would better advance SAEN's mission and increase SAEN's visibility, influence, and membership.

16.     Defendant Sonny Perdue is the Secretary of USDA. He is sued in his official capacity.

17.     Defendant USDA is an agency of the United States. The Animal and Plant Health Inspection Service ("APHIS") and Animal Care are units within USDA. Secretary Perdue, as well as USDA, APHIS, and Animal Care, are responsible for administering the AWA.[5]

## FACTS

18.     The purpose of the AWA is to insure the humane care and treatment of animals.[6]

19.     When enacting the AWA, Congress expressed a "continuing commitment … to the ethic of kindness" and recognized that "animals should be accorded the basic creature comforts of adequate housing, ample food and water, reasonable handling, decent sanitation, sufficient ventilation, shelter from extremes of weather and temperature, and adequate veterinary care ...."[7]

---

[5] Collectively, USDA, APHIS and Animal Care are hereinafter referred to as "USDA," unless otherwise specified.

[6] 7 U.S.C. § 2131.

[7] H.R. Rep. No. 91-1651 (1970), reprinted in 1970 U.S.C.C.A.N. 5103, 5104.

20.     In order to accomplish the AWA's purpose, USDA must, among other things, promulgate regulations governing the humane handling, care, treatment, and transportation of animals covered by the AWA. USDA must also inspect AWA licensees for potential violations of the AWA and its regulations.[8]

**USDA Fails to Address Mistreatment and Abuse of Dogs and Puppies at Puppy Mills**

21.     Through its provisions regulating dealers and breeders, the AWA governs what are commonly known as "puppy mills."[9]

22.     Puppies bred at mills often develop severe health problems, the treatment of which falls upon the unsuspecting consumers who purchase these puppies as family pets.

23.     In May 2010, the OIG released a report following its audit of USDA's inspection of "problematic" large-scale dog breeders and brokers.[10]

24.     OIG initiated the 2010 report following two years of "significant media coverage concerning large-scale dog dealers … that failed to provide humane treatment for the animals under their care."

25.     OIG noted that puppy mills "have stirred the interest of the public, Congress, animal rights groups, and others."

26.     The 2010 OIG report identified "major deficiencies with APHIS' administration of AWA" with respect to puppy mills, including, among other things:

  a.     "[USDA Animal Care's] Enforcement Process Was Ineffective Against Problematic Dealers";

---

[8] 7 U.S.C. §§ 2143, 2146.

[9] *Id.* § 2132; *see also* 9 C.F.R. § 1.1.

[10] Audit Report 33002-4-SF, "Animal and Plant Health Inspection Service Animal Care Program Inspections of Problematic Dealers" (May 2010).

b.  "[USDA Animal Care's] Inspectors Did Not Cite or Document Violations Properly To Support Enforcement Actions";

c.  "APHIS' New Penalty Worksheet Calculated Minimal Penalties;"

d.  "APHIS Misused Guidelines to Lower Penalties for AWA Violators;" and

e.  "Some Large Breeders Circumvented AWA by Selling Animals Over the Internet."[11]

27.   The 2010 OIG Puppy Mill Report further found:

[Animal Care's] enforcement process was ineffective in achieving dealer compliance with AWA and regulations, which are intended to ensure the humane care and treatment of animals. The agency believed that compliance achieved through education and cooperation would result in long-term dealer compliance and, accordingly, it chose to take little or no enforcement action against most violators.

However, the agency's education efforts have not always been successful in deterring problematic dealers from violating AWA. During FYs 2006-2008, at the re-inspection of 4,250 violators, inspectors found that 2,416 repeatedly violated AWA, including some that ignored minimum care standards. Therefore, relying heavily on education for serious or repeat violators—without an appropriate level of enforcement—weakened the agency's ability to protect the animals.[12]

**State and Local Governments Are Forced to Take Action Against Animal Abuse at Puppy Mills**

28.   In the absence of any adequate federal response remediating the cruelty of puppy mills, many state and municipal governments have responded through local regulation of dog and cat commercial breeders.

---

[11] *Id*. at 1-2.

[12] *Id*. at 1.

29.     Many jurisdictions passed anti-puppy-mill legislation prohibiting pet stores from purchasing puppies from dog breeders with a threshold number of USDA-issued citations for violations of the AWA.

30.     Examples of such anti-puppy-mill legislation include Conn. Gen. Stat. Ann. § 22-354 (effective Oct. 2014);[13] Nassau County, N.Y., Miscellaneous Laws tit. 79, § 4 (effective Aug. 2014.); Suffolk County, N.Y., Code ch. 299, art. VIII, § 299-58 (effective 2014); N.J. Stat. Ann. § 56:8-95.1 (effective June 2015); La. Stat. Ann. § 3:2511 (effective June 2016); Ariz. Rev. Stat. Ann. § 44-1799.10 (effective Aug. 2016); Va. Code Ann. § 3.2-6511.1 (effective July 2017); and 225 Ill. Comp. Stat. Ann. 605/3.8 (effective Aug. 2017); and Md. Code Ann., Bus. Reg. § 19-702.1 (effective Oct. 2017).

**Puppy Mills and Commercial Breeders Seek to Circumvent State and Local Anti-Puppy-Mill Legislation**

31.     On or about July 25, 2014, MAAL attended an industry meeting held jointly by USDA and Missouri Department of Agriculture. Approximately one-hundred commercial dog breeders and related industry members were in attendance.

---

[13] For example, Conn. Gen. Stat. Ann. § 22-354(b) states in relevant part:

> No pet shop licensee shall purchase a dog or cat for resale or sell or offer for sale any dog or cat purchased from: (1) Any breeder that ... (B) …committed a direct violation of pet dealer-related regulations of the [USDA] during the two-year period prior to such purchase, or (C) …committed three or more indirect violations of pet dealer-related regulations of the [USDA] during the two-year period prior [if the] violations pertained to the health or welfare of an animal..; or (2) any other person, firm or corporation that: …committed a direct violation of pet dealer-related regulations of the [USDA] during the two-year period prior to such purchase, (C) …committed three or more indirect violations of pet dealer-related regulations of the [USDA] during the two-year period prior [pertaining] to the health or welfare…, or (D)…obtained such dog or cat from a breeder described in subdivision (1)"

32.     Commercial dog breeders expressed disappointment that some pet stores and brokers were refusing to purchase dogs, or were paying reduced prices, if breeders had citations on their inspection reports.

33.     At the same meeting, USDA announced that, moving forward, certain AWA violations would be considered "teachable moments" and would not be documented on inspection reports.

**USDA Fails to Adequately Address Mistreatment and Abuse of Animals in Laboratories**

34.     In December 2014, the OIG released a report, following its audit of USDA's inspection of research facilities using animals subject to the AWA.[14]

35.     The OIG report found, among other things:

   a.   "APHIS Closed Cases Involving Animal Deaths";

   b.   "Since FY 2001, [USDA Animal Care] conducted at least 500 inspections at 107 research facilities that had not used, handled, or transported any regulated animals for more than 2 years [and] 14 of the 107 research facilities had not used regulated animals for as long as 13 years …. As a result, [Animal Care] did not make the best use of its limited resources, which could have been assigned to inspect other more problematic facilities, including breeders, dealers, and exhibitors.";

   c.   "Some Institutional Animal Care and Use Committees Are Not Adequately Monitoring Research Facilities";

---

[14] Audit Report 33601-0001-41, "Animal and Plant Health Inspection Service Animal Care Program Inspections of Problematic Dealers" (Dec. 2014).

d. "[Investigative and Enforcement Services] Offered Reduced Penalties to Some Violators"; and

e. "[Veterinary Medical Officers] Did Not Always Review Protocols and Annual Reports, as Required[.]"[15]

**USDA Issues "Teachable Moments" Rule Without Notice and Comment**

36.    Defendants issue a publication called the Animal Welfare Inspection Guide, which sets forth how USDA inspectors are to administer and enforce the AWA.

37.    AWA licensees, including but not limited to commercial dog breeders, have access to the Animal Welfare Inspection Guide and know their rights thereunder.

38.    On information and belief, on or about January 14, 2016, Defendants updated the Animal Welfare Inspection Guide to include the TM Rule.

39.    Defendants did not provide public notice and comment before issuing the TM Rule.

40.    USDA defines the TM Rule as follows: [16]

> **2.4.3. Teachable Moments**
>
> Teachable Moments are minor NCIs identified during an inspection that meet certain criteria and are not cited on an Inspection Report. Cite any noncompliance that is adversely impacting the health or well-being of an animal on the Inspection Report. If you identify an area that is not a noncompliant item, but you are concerned that it may become one in the future, discuss the concern with the licensee/registrant, but do **not** list it as a teachable moment.

41.    With respect to the TM Rule, USDA directs inspectors to act accordingly:[17]

---

[15] *Id.* at p. 5, 8, 13, 16, 28.

[16] United States Dep't of Agric., Animal Welfare Inspection Guide 2-8 (March 2019).

[17] *Id.*

> The inspector should decide if each issue observed on an inspection is (in this order):
>
> 1. **In compliance**, but an area of concern or discussion topic that is **not** a teachable moment or an NCI. This could be a talking point during the exit discussion.
>
> 2. A **Teachable Moment** that meets **all** the following criteria:
>    - Is a minor NCI that is not adversely impacting animal welfare, **and**
>    - Is not likely to soon become a serious, Direct or other Critical, or Repeat NCI, **and**
>    - Is not a Direct or other Critical, **and**
>    - The facility/site is willing and able to correct the issue quickly, **and**
>    - Was not previously listed as a Teachable Moment or cited at the site within the last two years
>
> 3. An **NCI** that should be cited, includes but not limited to, any issue that:
>    - Is noncompliant **and** does not meet the criteria to be a Teachable Moment, **or**
>    - Was previously cited or identified as a Teachable Moment at the site, **or**
>    - Is a Direct or other Critical, **or**
>    - Falls under a section of the Regulations or Standards that is already being cited (for example, if you are already citing 3.10 Watering, then anything that falls under this Standard would be cited and would not qualify as a Teachable Moment)

42.    USDA places the following restrictions on the TM Rule:[18]

> ### 2.4.3.1.  Use of Teachable Moments
>
> Teachable Moments are **not** appropriate, and are **not** to be used:
>
> - During a Prelicense or New Site Approval inspection
> - At any facility/site with a poor compliance record. For this facility/site, all NCIs **must** be documented on the Inspection Report. A poor compliance record generally includes a facility/site with:

---

[18] *Id.* at 2-8, 2-9.

- ○ Directs or other Criticals, and/or multiple Repeats
- ○ Citation(s) for refusal of inspection or interference
- ○ An investigation or recent enforcement action
- ○ With an open case(s) at OGC (there may be exceptions to this)

**NOTICE**

If you are planning to write up four or more Teachable Moments, contact your SACS to verify whether these are all valid Teachable Moments.

#### 2.4.3.2. Special Considerations

Note the following:

- On the first inspection after a license is issued, limit Teachable Moments to recordkeeping and identification issues
- On the first inspection after registration, use of Teachable Moments is appropriate
- Numerous Teachable Moments are a "red flag." There should be prompt follow-up at these facilities/sites to ensure that compliance is achieved. Therefore, they should be re-inspected or have a courtesy visit within 90 days.

There may be exceptions to these criteria. If you are uncertain about the use of Teachable Moments at a facility/site, contact your SACS.

#### 2.4.3.3. Documenting Teachable Moments

The inspector must enter the Teachable Moments into the Teachable Moments screen in ACIS:

- Check the licensee/registrant's name, customer ID, certificate number and site to make sure the information is correct
- Enter the inspection date, section number of each Teachable Moment, and a brief description of the Teachable Moment

43.     USDA offers the following example of proper use of the TM Rule:[19]

---

[19] *Id.* at 2-10.

| EXAMPLE | Teachable Moment for 3.1(c): |
|---|---|
| | **Not enough detail**: Dirty den boxes/carpet strings |
| | **Too much detail**: Two pens in the Yorkie area in the top barn (# 3 and 4) have mild staining around the den box opening and should be cleaned more frequently. In 2 pens in the whelping area, # 6 and 8, housing 2 litters of poodles, there are carpet strings/excessive wear on 25% of each carpet. The owner did not want to disturb the new mother for the last couple days but has a plan to replace the whelping carpets with the pups tomorrow. |
| | **Appropriate detail**: Two pens with staining at den box door (needs more frequent cleaning) & 2 whelping boxes with worn carpets need carpets replaced. |
| Provide one copy of the Teachable Moments to the licensee/registrant, and review in ACIS prior to the next inspection. | |

**The Teachable Moments Rule is Abused and Employed in Lieu of Issuing Citations for Violations of Law Impacting Animal Welfare**

44.     Defendants' purpose and design behind the TM Rule is to decrease the number of citations issued by inspectors for violations of the AWA. USDA, in principle, requires its inspectors to refrain from employing TM Rule in instances adversely impacting animal welfare.[20]

45.     But Plaintiffs' investigations confirm that USDA employs the TM Rule in instances which do in fact adversely impact animal welfare.

46.     Defendants know and have good reason to know that the TM Rule is abused and applied in an overly-broad manner, including in instances impacting animal welfare.

47.     For example, on July 11, 2017, pursuant to the TM Rule, USDA issued Purdue University a "teachable moment," for its failure to perform a procedure on a pig as set forth in the governing research protocol, in violation of the AWA. According to the "teachable moment" issued, the violation caused "catastrophic results" to the animal.

---

[20] United States Dep't of Agric., Animal Welfare Inspection Guide 2-8 (March 2019).

48.     Plaintiff SAEN obtained correspondence from Purdue University to the Office of Laboratory Animal Welfare at the National Institute of Health (NIH), dated August 1, 2017, which confirmed the pig described in the incident above did in fact die as a result of the AWA violation.

49.     Consequently, on February 25, 2019, Plaintiff SAEN wrote to USDA, reporting the improper use of the TM Rule in an incident resulting in the death of an animal. Plaintiff SAEN requested, among other things, USDA change Purdue University's AWA violation from a "teachable moment" to a "critical" citation, and that the inspector who performed the inspection and misused the TM Rule be properly educated. USDA did not respond.

50.     Furthermore, after the promulgation of the TM Rule, Defendants have issued dramatically fewer citations for violations of the AWA on an annual basis. Specifically, the number of annual citations plunged from 6,052 in 2014 to 1,716 in 2018.[21]

51.     Defendants' employment of the TM Rule, including employment of the TM Rule in express violation of its own terms, among other things, contributes to the decrease in citations issued by USDA under the AWA; inhibits the public, retailers, and consumers from making informed choices with respect to transactions involving or impacting animals; and contributes to decreases in penalties assessed against licensees for violations of the law.[22]

---

[21] "Caged racoons drooled in 100-degree heat. But federal enforcement has faded." WASHINGTON POST, Aug. 22, 2019, *available at* https://wapo.st/2HlQW51; *see also* "The USDA is issuing far fewer citations to zoos, labs and breeders for animal welfare violations." WASHINGTON POST, Feb. 26, 2019, *available at* https://www.washingtonpost.com/science/2019/02/26/usda-is-issuing-far-fewer-citations-zoos-labs-breeders-animal-welfare-violations/.

[22] *See, e.g.*, 7 U.S.C.A. § 2149 ("The Secretary shall give due consideration to the appropriateness of the penalty with respect to the size of the business of the person involved, the gravity of the violation, the person's good faith, and the history of previous violations.").

**USDA Issues "Self-Reporting Rule" Rule Without Notice and Comment**

52.     On or about December 2017, and again on or about May 2018, USDA published

"Tech Notes" setting forth the Self-Reporting Rule.[23]

53.     On information and belief, on or about March 2019, Defendants updated the

Animal Welfare Inspection Guide to include the Self-Reporting Rule.

54.     USDA sets forth the Self-Inspection Rule as follows:[24]

---

### 2.4.2. Incentives for Identifying, Reporting, Correcting, and Preventing   Noncompliance

Animal Care is committed to encouraging dealers, breeders, exhibitors, research facilities, carriers, and intermediate handlers to proactively identify, report, correct, and prevent issues involving animal welfare that may occur at their facilities.  We will **not** cite on an Inspection Report a noncompliance that is identified outside of the inspection process if the criteria below are met.

#### 2.4.2.1.  Criteria

##### 2.4.2.1.1 Non-Critical Noncompliances

A non-Critical noncompliance will **not** be cited on an Inspection Report if the facility:

* Timely discovers the noncompliance using its own compliance monitoring program (*i.e.*, the facility identifies it on its own and not because of a local, state, federal or third-party inspection program), **AND**

* Immediately takes appropriate corrective action and swiftly establishes measures to prevent recurrence

##### 2.4.2.1.2 Critical Noncompliances

A Critical noncompliance occurring outside a Routine or Focused Inspection, if it does not constitute a "Repeat" noncompliance, will not be cited on an Inspection Report, if the facility **at the specific site**:

* Has no Repeat or Critical noncompliance on any Inspection Report for that

---

[23]     *See*, *e.g.*, USDA APHIS AC, Tech Note (May 2018), *available at* https://www.aphis.usda.gov/publications/animal_welfare/2017/ac-tech-note-incentives-animal-welfare-act-compliance.pdf.

[24] United States Dep't of Agric., Animal Welfare Inspection Guide 2-6, 2-7 (March 2019).

site during the preceding 12 months, **AND**

- Timely discovers the noncompliance using its own compliance monitoring program, **AND**

- Has not voluntarily reported a noncompliance that falls within the same section and subsection of the AWA Regulations and Standards during the preceding 24 months, **AND**

- Immediately takes appropriate corrective action and establishes measures to prevent recurrence, **AND**

- Promptly reports the incident (*i.e.*, generally within 5 days of discovering a noncompliance), orally or in writing, to its Animal Care inspector or any Animal Care office and cooperates with the inspector as he/she reviews the incident

### 2.4.2.2. Facility Reporting an Incident

When a facility reports an incident, the inspector will first assess whether it is an AWA noncompliance. The inspector may discuss the outcome with his/her SACS and, as needed, will reach out to the facility operator by phone or visit the facility for additional information.

If the incident does not involve a noncompliance, the inspector will share the assessment with the facility operator and conclude the review.

If the incident does involve a noncompliance and the facility **meets all factors above**, the inspector will:

1. Not document the noncompliance on an Inspection Report, and

2. Follow the instructions for tracking the facility's self-reporting by notifying Program Support with the following information:

   ○ Licensee/registrant's CID

   ○ Site number

   ○ Date of the incident

   ○ Section number of the noncompliance, and

3. Share the assessment with the facility operator

If the incident does involve a noncompliance and the facility does not meet one or more of the factors above, the inspector will:

1. Document the noncompliance on the Inspection Report during the next inspection, **and**

2. If not corrected and if not a Repeat noncompliance, include a correction date, **or**

3. Indicate that the issue has been corrected on the Inspection Report

55.     Defendants did not provide public notice and comment before issuing the Self-

Reporting Rule.

**The Self-Reporting Rule is Employed in Lieu of Issuing Citations for Violations of Law Impacting Animal Welfare**

56.     The Self-Reporting Rule is applied in a manner that shields violations of the law that impact animal welfare.

57.     Unlike the TM Rule, the Self-Reporting Rule requirements do not purport to constrain application in instances impacting animal welfare.

58.     For example, upon information and belief, a zebra owned by an AWA licensee doing business as a traveling zoo escaped, ran into traffic, and was killed by a car. Upon information and belief, the licensee self-reported pursuant to the Self-Reporting Rule, and did not receive a citation for violating the AWA.

59.     Defendants' employment of the Self-Reporting Rule, among other things, contributes to the decrease in citations issued by USDA under the AWA; inhibits the public, retailers, and consumers from making informed choices with respect to transactions involving or impacting animals; and contributes to decreases in penalties assessed against licensees for violations of the law.[25]

## FIRST CLAIM FOR RELIEF
**Violation of Administrative Procedure Act as to TM Rule**

60.     Plaintiffs repeat and incorporate all allegations in each of the preceding paragraphs.

61.     Publication of the Animal Welfare Inspection Guide, which sets forth the TM Rule, is a final agency action for purposes of APA.

---

[25] *See, e.g.*, 7 U.S.C.A. § 2149 ("The Secretary shall give due consideration to the appropriateness of the penalty with respect to the size of the business of the person involved, the gravity of the violation, the person's good faith, and the history of previous violations.")

62.     Promulgation of the TM Rule described above constituted "rule making" within the meaning of the APA, 5 U.S.C. § 551(5), and was so subject to the notice and comment requirements of 5 U.S.C. § 553.

63.     The TM Rule is a substantive and legislative rule that limits administrative discretion, effects a substantive change in existing law and policy, and is administered with binding effect.

64.     The TM Rule has a practical binding effect because private parties, i.e., commercial dog breeders and private, for-profit research facilities handling animals, can rely on it as a norm or for safe harbor, allowing licensees to reliably violate the AWA without citation.

65.     The TM Rule imparts substantive rights upon AWA licensees, which they would not have had Defendants not issued the TM Rule.

66.     The TM Rule is *not* an interpretative rule; general statement of policy; or rule of agency organization, procedure, or practice.

67.     The TM Rule is not based on specific statutory or regulatory provisions, nor does it interpret or clarify a specific statutory or regulatory provision.

68.     The TM Rule has a present, binding effect; appears on its face to be binding; and is applied in a way that indicates it is binding.

69.     The TM Rule is sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA.

70.     Defendants, however, did not provide notice or permit comment before issuing the TM Rule.

71.     The TM Rule is, therefore, unlawful and should be set aside under 5 U.S.C. § 706(2)(D).

72.    As a result of Defendants' actions and omissions described herein, each Plaintiff has suffered a concrete and particularized injury that is actual or imminent.

73.    There is a causal relationship between Defendants' conduct as alleged herein, and each Plaintiff's injury.

74.    The offending conduct is likely to continue, and therefore, will continue to injure each Plaintiff.

75.    The relief requested by Plaintiffs will redress Plaintiffs' injuries.

**SECOND CLAIM FOR RELIEF**
**Violation of Administrative Procedure Act as to Self-Reporting Rule**

76.    Plaintiffs repeat and incorporate all allegations in each of the preceding paragraphs.

77.    Publication of the Animal Welfare Inspection Guide, which sets forth the Self-Reporting Rule, is a final agency action for purposes of APA.

78.    Promulgation of the Self-Reporting Rule described above constituted "rule making" within the meaning of the APA, 5 U.S.C. § 551(5), and was so subject to the notice and comment requirements of 5 U.S.C. § 553.

79.    The Self-Reporting Rule is a substantive and legislative rule that limits administrative discretion, effects a substantive change in existing law and policy, and is administered with binding effect.

80.    The Self-Reporting Rule has a practical binding effect because private parties, *i.e.*, commercial dog breeders and private, for-profit research facilities handling animals, can rely on it as a norm or for safe harbor, allowing licensees to reliably violate the AWA without citation.

81.    The Self-Reporting Rule imparts substantive rights upon AWA licensees, which they would not have had Defendants not issued the Self-Reporting Rule.

82.     The Self-Reporting Rule is *not* an interpretative rule; general statement of policy; or rule of agency organization, procedure, or practice.

83.     The Self-Reporting Rule is not based on specific statutory or regulatory provisions, nor does it interpret or clarify a specific statutory or regulatory provision.

84.     The Self-Reporting Rule has a present, binding effect; appears on its face to be binding; and is applied in a way that indicates it is binding.

85.     The Self-Reporting Rule is sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA.

86.     Defendants, however, did not provide notice or permit comment before issuing the Self-Reporting Rule.

87.     The Self-Reporting Rule is, therefore, unlawful and should be set aside under 5 U.S.C. § 706(2)(D).

88.     As a result of Defendants' actions and omissions described herein, each Plaintiff has suffered a concrete and particularized injury that is actual or imminent.

89.     There is a causal relationship between Defendants' conduct as alleged herein, and each Plaintiff's injury.

90.     The offending conduct is likely to continue, and therefore, will continue to injure each Plaintiff.

91.     The relief requested by Plaintiffs will redress Plaintiffs' injuries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.     Enter a declaratory judgment that Defendants have violated the APA by failing to notify the public and afford it an opportunity to comment on the TM Rule and the Self-Reporting Rule;

B.      Enter an order vacating the TM Rule and the Self-Reporting Rule, and enjoining Defendants from using the TM Rule and the Self-Reporting Rule, or any substantive equivalent, unless and until such procedures have been adopted through notice-and-comment rulemaking;

C.      Award Plaintiffs their costs and expenses, including reasonable attorney's fees pursuant to applicable statutes and/or rules; and

D.      Grant such further and additional relief as this Court may deem just and proper.

Dated:  October 4, 2019.

Respectfully submitted,

/S/Vanessa Shakib
Vanessa Shakib*
Ryan Gordon*
ADVANCING LAW FOR ANIMALS
409 N. Pacific Coast Highway, Suite 267
Redondo Beach, CA 90277
Tel.    (202) 996-8389
vshakib@advancinglawforanimals.org
rgordon@advancinglawforanimals.org

/S/Nigel Barella
Nigel Barrella (D.C. Bar No. 1005592)
BARRELLA LAW PLLC
1001 Pennsylvania Ave NW, Suite 1300N
Washington, DC 20004
Tel.    (202) 768-7510
nigel@barrellalaw.com

Attorneys for Plaintiffs

* Admitted *pro hac vice*